We'll call our next case, 22-1236, W. v. Poudre School District. Good morning. My name is Jack Robinson. I represent the appellants, Alex, Marlene, and Bill. You speak up, please. Sure. The school district here violated the Individuals with Disabilities Education Act by failing to provide Alex a free, appropriate public education. Absent from the district court's decision was a consideration of progress, progress regarding Alex's most critical need, behavioral functioning. Well, we have indications in the reports that were generated as time went on that they set standards or goals and that goals, some of the goals were met or at least partially met. Should we look at that to determine progress? No. That's not enough? That's not enough. What should we look at? You should look at, well, critically, three, four documents you should pay attention to. The school district's own September 2017 evaluation report. That's Complainants Exhibit I. That's at Appendix Volume 3 at pages 642 to 645. Also, the school district's own May 2018 Functional Behavioral Assessment. That's Complainants Exhibit U at Appendix Volume 3 at pages 716 to 736. The August 2018 Independent Functional Behavioral Assessment, before by the school district at Complainants Exhibit FF. That's Appendix Volume 3 at pages 754 to 777. And then finally, the September 2018 Neuropsychological Evaluation. That's Complainants Exhibit HH. That's Appendix Volume 3 at pages 794 to 813. And so, because what's critical in those documents, both from the school district's own work as well as from independent experts, that Alex was in a behavioral crisis. He could not function at school. And one of our goals, our main goal here in this appeal, is for the court to find that behavior is functioning. And behavior is critical to education. And unless a child's behavior functioning is properly assessed and addressed, then the child is not receiving an appropriate education. So you're not saying that they were not aware of his behavioral issues, but rather the word assessed, it keeps floating through these briefs. And that, to me, is such a vague concept. You're talking about some type of specialized evaluation that should have occurred that did not occur? That's exactly right. And that would have been what? Well, one, so that it goes to, and ALJ found, too, at the hearing, that school districts should have conducted a neuropsychological evaluation that would have determined not the diagnosis of autism. The school district knew that Alex had autism. That's not the important point. The important point is that you drill down on the autism and how that impacts Alex's ability to function, be educated at school. Neuropsychological is one. Functional behavioral assessment is the other. And ALJ also, at the due process hearing, found that the school district should have done a functional behavioral assessment not to determine which behaviors he had. Those were self-evident, and those are in the records, that he has these behaviors, and that those behaviors impact his ability to access education, to function at school. What was missing from the school district's assessments were, what's the trigger for these behaviors? Why is he doing what he's doing? What strategies can we put in place such that he can make progress on those behaviors? He can improve those behaviors and become a functioning member of society. Counsel, you agree, though, that the IDEA statute doesn't always require an FBA, right? I agree. And that's the problem, right? And that is at the heart of our case, right, is that the statute, the IDEA says, in this specific circumstance, when a child is removed from class for disciplinary reasons, you need to do a functional behavioral assessment. That's where that phrase comes up. Behavioral intervention plan or behavior support plan is not mentioned in the IDEA either. But an IEP is required, or an IEP team is required, to determine whether a child's behaviors interfere and pair with their ability to access education. And if that's the case, they need to develop a coherent, cogent plan to address those behaviors. And what would you cite for that particular proposition? So if we start from the point of departure that this case is not about discipline, and the IDEA doesn't require, how do we discern here based on the actual statute and any case law that we could look to that would set sort of the parameters for us to determine whether it was satisfied here? Well, I would start with the IDEA does require this functional behavioral assessment. But not in this case. So let's start with in 1414B, I think it is, the IDEA has very, very detailed provisions with regard to the areas that a school district is required to evaluate, assess a child, the manner in which they do that. And it specifically includes not just academic assessments, but functional and developmental assessments. Functional is behavior, right? How does the child function at school? And so the school district doesn't, not only has to determine grabbing, kicking, hitting, biting, clearing the table, those are behaviors. But what's behind those behaviors? What are causing those behaviors? And how can we work towards, how can we have a cogent plan to allow that child to improve those behaviors such that they then can access unlocking, matching colors or identifying body parts? Council, what I'm struggling with is, I find your argument in some ways quite persuasive. But the law certainly doesn't allow us to craft, as judges, a perfect plan. So we're just trying to assess whether there was compliance, statutory compliance here. And so help me support your argument with more clear doctrinal parameters. I understand the facts that you're arguing, but I'm really trying to get there as a matter of law. Well, as a matter of law, I would start with the statute, 1414B, right, that requires a school district when a child initially comes into the school system. And every three years, there's very detailed procedures about the evaluations that a school, the assessments that a school district needs to perform on that child to determine all areas of suspected disability and how those disabilities impact their ability to be educated. And education, again, is not just academics. It is functioning. So do you agree that the record shows that the district did identify Alex's behaviors? So one of the main problems, the school district, I mean, it's evident, right, and that's why I listed those documents for you to look at. It's evident that this child was in a behavioral crisis. You know, a teacher, a paraprofessional, would turn their attention and he'd clear the table, run to the door, lift the door, couldn't walk down the hallway by himself. That is a child that's not functioning in school. The school district was aware of it, but their response was, we have educational control. What that means is is that they are blocking him from doing certain things. They're putting their hand on his hand to prevent him from doing something. They're not, they don't have a plan to address that, and that's, you know, it's shown through, is replete in all of the documents. My point is, because I know I feel like you're stuck on this, is where in the IDEA does it require the school district to perform a functional behavioral assessment, right? Because I think the attention gets diverted to 14, 15, whatever, that says functional behavioral assessment over here. I guess my point is, is that a functional behavioral assessment, and council cannot disagree with this, right, that a functional behavioral assessment is the same as a speech-language assessment, psychoeducational assessment, any type of assessment. There's nothing, a functional behavioral assessment is just a word used to determine what is triggering this behavior, why is it occurring, what are the consequences, and how do we address this? I would say, too, the Colorado Department of Education has a whole office in the special education department on behavior, training school staff to perform functional behavioral assessments, not for the kids that are disciplined, not for the kids that are removed from class due to disciplinary reasons, but because functional behavioral assessments are a fundamental, integral part of assessing the child's disability-related needs. Council, could I ask you to clarify something I thought you said earlier, but I may have missed it. I thought that one of your arguments, and this is sort of shifting gears a little bit, was that the district failed to evaluate Alex for autism and instead just relied on that children's hospital evaluation. Is that an argument that you're making today? Yes. It is? Yes. Okay. And so on that, too, I would point the court, and again, this sort of goes to the court's modified de novo review of accepting the factual findings of the district court unless they're contrary to the administrative record. Here, the court relies upon pages 8 through 10 of its decision, and then throughout the decision, on a 2011 children's hospital report... That wasn't a typo? You think that was a substantive... Well, she actually cites to it, one, two, three, four, 10, 15 times, and then throughout her decision that, hey, look, the school district did do an assessment regarding autism, did do an assessment regarding how the autism impacted Alex's ability to function at school. But she cited to a 2011 children's hospital report that was never considered by the school district. What if it had said 2014? Well, the 2014, I have that right here. Well, it's in here. The 2014 report... That was before the school district had that? Well, and again, this report is completely wrong. The 2014 report is right here. It's Poudre School District's Exhibit 1. I don't have the appendix numbers, but this doesn't have anything to do with autism. It's a speech evaluation. It's an OT evaluation, and it's a hearing evaluation. So it wasn't... The district court, unfortunately, looked for evidence and went to this 2011 report that we introduced to the ALJ, but was never considered by the school district, certainly never included... Well, it was provided to them. They were aware of it, were they not? We believe they were aware of it, but it doesn't show up in their evaluation report. It doesn't show up in the IEP. And so as far as the evidence goes and as far as the crafting of Alex's IEPs, it was nonexistent. So it was error for the district court to rely upon a report. One, it was four years prior. But two, the court was just incorrect. Actually, unless there's other questions right now, I reserve the remainder of my time for rebuttal. Good morning, Your Honor. May it please the court. I'm Robert Montgomery for the appellee cross-appellant Poudre School District. There are two primary issues here. The first is whether the school district offered and provided Alex W. a free appropriate public education. The second issue on the school district's cross-appeal is whether the school district appropriately responded  or an IEE at public expense appropriately. First, Your Honor, I want to address the standard here. In IDEA cases, we have a modified de novo standard of review. And the findings of fact of the lower court are given deference unless shown that they were not thorough and careful. Notably, when educators demonstrate that they've brought their expertise to bear on a situation, they're also provided deference in the development of a child's IEP. And courts should not substitute their own notions of sound educational policy for that of the professionals. Here, the school district would argue that the record here is replete of the school district using its expertise in the development of Alex's IEPs across time. Could you respond to your friend's argument on the autism evaluation with this 2011-2014? Yes, Your Honor. The IDEA requires that school districts evaluate students in all areas of suspected need. And they're required to use a variety of assessment tools in assessing those needs, whether or not they're directly related or typically tied to a disability category. Here, specific to autism, as we pointed out, there was a diagnostic report from earlier in Alex's life. School district personnel are not diagnosticians. What they do is assess the needs of a student. What their expertise brings is what is typically impacted, or what are the impacts of autism typically. And that's the children's hospital evaluation that you're speaking of, okay. Yes, Your Honor. So they had that, they knew that, they began with that and worked from that? Yes, Your Honor. Is that correct? That's correct. And actually, I think my colleague's mistaken here because the school district does note and discuss that evaluation report both in the 2014 evaluation report and the 2017 evaluation report from the school district. Does the 2014 report discuss autism? Yes, it discusses that he is diagnosed with autism, Your Honor. And then it goes in to discuss multiple potential impacts of autism. So again, autism impacts children in several ways. It can impact their behavior, it can impact their social communication, their pragmatic functioning, and things like that. So there's multiple tools that school districts use to tease out what is the impact of autism. Here, if you look at the evaluation reports themselves, they've performed an assessment called the Adaptive Behavior Assessment System, or the ABAS. And that tests a student's skills with respect to everyday living. How do they perform things? What behaviors are triggered when they're trying to perform things or when demands are placed upon them? There's robust communication assessments that assess the student's ability to interact with their teachers and their peers, which can also inform how you program for a student when you're developing the IEP. The occupational therapist also performed what's called sensory assessments, which is a student's reaction to different sensory stimuli in their environment. That can impact their behaviors. That's also a potential impact of autism. And so it doesn't do any good to diagnose a student or do an autism diagnostic exam. What really needs to be done here is what are the impacts of autism on the child? And here with Alex, he's a significantly impacted kiddo. He's got Down syndrome as well. He has a vision impairment. He has a hearing impairment. And so many of these impacts overlap. And so to look at him in a vacuum, I think does him a disservice here. And so what is then the main complaint? That there were insufficient professional evaluations throughout his stay with the school district? Well, no, Your Honor, I don't know that there's... that I can even identify that. What I hear is that the appellants believe that we should have performed a functional behavior assessment. Right. And when school district did its evaluations, a functional behavior assessment, like the others I've mentioned, is a very specific tool. It's used to identify why a child performs a potential behavior. Here, looking at the record, multiple teachers testified that they understood the functions of Alex's behaviors. Primarily, he was looking to escape certain tasks placed upon him. He was trying to greet people. Again, that goes... that speaks straight to his communication impacts of both autism and his intellectual disability. And so there wasn't a need at the time for a functional behavior assessment because they understood... Is the argument that the individuals that were interacting with him at the school, that they were not qualified to fully understand his behaviors and to respond to them appropriately? I mean, are we talking expertise here? Well, if that is what we're talking about, I don't think that's the right conversation because these people were incredibly qualified. Every single one of them was at least a master's level special education teacher and licensed... Was that an issue in the district court? No, it was not, Your Honor. And so really the issue was whether or not the school district needed to, in order to provide FAPE, perform a functional behavior assessment and develop a behavior intervention plan. Here, Alex's IEP that was developed with those assessments that I just discussed offered him FAPE. It addressed these behaviors and his other needs very directly. So I guess one other point here is to move to the IEP and whether it offers FAPE. And again, we're specifically talking about 2016 and 2017. Well, and I guess the ones before as well. So are we talking about the ones before? We're not talking about those, Your Honor. Those are barred by the statute of limitations. And I can address that argument now if you'd like. But that's, I just... No, no. And I guess just I'll say two things on that. One, that wasn't preserved. The appellants had the opportunity to preserve that argument even in front of the administrative law judge and did not. They could have raised it again with additional evidence. And specifically, what is the argument that you're contending was way of the discovery date argument or just... Yes, all of it, Your Honor. We moved that there wasn't an identified discovery date other than it accrued at the time. Sort of the no or should have known date? Exactly, yes. Wasn't one of the issues whether the occurrence date or the discovery date were appropriate? Well, I would argue that the appellants did not make that an issue, Your Honor. I think they used that language, but they don't identify what the known or should have known by or the discovery date was. And in fact, in their briefs and arguments, they even allude to they knew about the potential violations that they raised at the time that they accrued back in 2014 and 2015. They made comments for examples along the lines of they didn't... Or they were trying to work with the school district and those kinds of things suggesting that they knew about potential claims as they arose. And could you clarify the reason you're contending that that's waived is because it wasn't developed in front of the ALJ? I think two. First, in front of the ALJ, Your Honor, the very beginning of the due process hearing, the ALJ ruled on the school district's partial motion to dismiss everything beyond two years. Council responded that they... Or, I'm sorry. The ALJ provided the opportunity to make a record. They didn't take advantage of that. They simply said, I understand. IDEA also provides an avenue in the statute to submit additional evidence at the request of the parties. That was not taken advantage of at the district courts. There were two opportunities. And the complaint filed here, does it raise the statute of limitations? No, it was not, Your Honor. Claim? No, it was not. Going back to the IEP itself and addressing its behavior, the appellants discussed very specific behaviors that Alex had, including grabbing people as he walked by, mouthing objects, clearing tables. They refer to him as a child in behavior crisis, and I just don't think the record shows that. And I don't think that's a fair characterization of Alex. One, if you look at his IEP goals, they consider multiple areas of functioning for Alex and trying to help him access in multiple different areas. But another area that they do particularly address is some of these very specific behaviors. When we assess the reasonableness of an IEP, are we looking at it at the time it was drafted? Yes, you are, Your Honor. Was it reasonably calculated at the time it was drafted to enable the child to make progress in light of his circumstances? And again, expanding this from simply his behaviors, Alex's circumstances include his cognitive disability, his vision impairment, his hearing impairment, the components of autism that impact him. I think the most obvious example of working towards improving these behaviors that counsel raised are in the fourth goal in his 2017 IEP. There's also several objectives within goals two, goals one that address these. If you look at the accommodations in those IEPs, there's very specific behavior modification strategies that they'll use to help Alex access education. And then maybe the most important component is the service delivery statement in both the 2016 and 17 IEPs. He was in a program in PSD called the ILS program, which is specific to students with intellectual disabilities that includes students with autism. And it includes what they call a behavior shaping component. And they use components of what's called applied behavior analysis to help students replace or learn new behaviors from these other examples. And so that's built into his service delivery statement as well. The IDEA does not require a behavior intervention plan. The IDEA requires that school districts consider the use of positive behavior interventions and supports in the IEP. And when you look at the goals, the accommodations, and the service delivery statement together, and you compare that especially to the evaluation reports, you can see that there's ample positive behavior interventions and supports. And when you look at his progress in the progress reports, you'll see that he made progress on every single one of those goals through his years. I want to address the issue of progress here, Your Honor. Council pointed you to four different documents to review Alex's progress here. Note that every single one of those are in some way an evaluation or an assessment. You're not measuring progress in an evaluation or an assessment. And if you look at the statute, an evaluation is supposed to essentially provide the IEP team the information it needs to develop a program. You need to understand who the student is at the time, and that helps you inform the development of the IEP at the time that it's written. Counselor, you have very little time left, and I'd like to hear about your cross-appeal. Yes, Your Honor. So the school district's cross-appeal here is whether the district appropriately responded to a request for an IEE. This was Dr. Huckabee's neuropsychological evaluation. The district complied  The rule says that parents are entitled to one IEE at public expense each time the school district evaluates a student. The school district evaluated a student in 2017. The parents requested an evaluation in IEE in January of 2018. Those were in the areas they wanted assessment from an independent occupational therapist and an independent speech-language pathologist. The district granted this, funded this, convened the IEP team to review that evaluation. Four months later, it gets the request for the neuropsychological evaluation. There was not an intervening comprehensive evaluation. So they would have to request an evaluation that's sort of a global evaluation right from the beginning. You get one shot, so you better ask for everything. Is that your point? That's correct, Your Honor. And the reason for that, I mean, it tracks with how we program for students. An IEP is supposed to be reviewed once every year. We're supposed to reconsider the student's present levels of performance. And then we're supposed to update the child's IEP to ensure we're providing access. If we keep having to say yes to multiple assessments, I mean, one, we're putting school district personnel and parents in a position to decide, well, what's an assessment versus what's an evaluation? But otherwise, this process, again, the first one here took three months, and that's not unusual. So what do we do with that argument that it seems the appellant is making that draws on that distinction between an assessment and an evaluation, that they were not seeking a second evaluation? Well, I... One, in this particular case, they did request an evaluation. The IDA defines evaluation as a combination of assessments. Here, the occupational therapist, the private one, performed multiple assessments. The speech-language pathologist performed multiple assessments. So you have an evaluation right there. So you're claiming this is a second request. That's correct, Your Honor. And so when you read the statute or the regulations as a whole here, it doesn't make policy sense to have to go back to the front and either... I'm sorry, may I finish? You may. It doesn't make sense to go all the way back to the front and either grant the IEE or require the school district to file a due process complaint, which puts the parties in litigation. Well, didn't the school district have an obligation to either fund the evaluation or file a complaint? I think it had the obligation... They didn't do either. They didn't do either. It had the obligation to do that once, Your Honor, because the regulations say that parents are only entitled to one IEE. I understand that, but this was a second request. And if they didn't want to do it, shouldn't they have done one or the other? I don't think so, Your Honor, because, I mean, this is the policy concern that I raised. If school districts are required to continue to answer assessments by either funding them or going to due process, you're going to incentivize school districts to file for due process, which doesn't contribute to the collaboration between the parents and the school district and cost money. And, Counsel, actually following on Judge Kelly's question on that point, are you contending with respect to the error here that the district court just overlooked this particular CFR section? Yes, Your Honor. Did you make the argument about this to the district court? Yes, Your Honor, we did. I think they looked at that second request in a vacuum without the context of the first request and just applied that first part of the rule without considering the second part, which... So it's a legal error. Correct. Thank you. Thank you. Just real quick with regard to the Children's Hospital report, critical issue. The record is what it is, right? There's a 2011 Children's Hospital report. It's not included in any of the school records. There's a 2014 Children's Hospital report, which is right here. It's Cooter School District Exhibit 1. It's 17 pages long. It speaks for itself. It doesn't mention autism. Well, it does say that it says that there was a diagnosis. It just doesn't provide it. But it does acknowledge that there was a diagnosis. Right. And everybody, since he entered school, they knew he had autism. But the critical part of this and the error from the district court is that this 2014 Children's Hospital report is the only 2014 Children's Hospital report solely speech, OT, and hearing. I would also ask the panel to look at the September 2017 IEP. Compare that to the four documents that I referenced. That detail in the spring of, say, fall of 2017, spring of 2018, how debilitating Alex's behaviors are. You just read it. It's there. They have the information. And then look at the IEP and say, and it doesn't take an educator. None of us need to be an educator. You can look at the IEP and you can see to yourself, my child, my grandchild, does this address any of those behaviors? It doesn't. Thank you, counsel. The case will be submitted. Thank you for your helpful arguments this morning.